# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40093**

———————————

**UNITED STATES**
*Appellee*

**v.**

**James T. CUNNINGHAM**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 9 September 2022

———————————

*Military Judge:* Sterling C. Pendleton.

*Sentence:* Sentence adjudged on 18 February 2021 by GCM convened at Ellsworth Air Force Base, South Dakota. Sentence entered by military judge on 8 March 2021: Dishonorable discharge, confinement for 18 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Matthew L. Blyth, USAF; Major Spencer R. Nelson, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Abbigayle C. Hunter, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge KEY and Judge GRUEN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

ANNEXSTAD, Judge:

At a general court-martial, a panel of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of murder, in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918.[1] Appellant elected to be sentenced by the military judge. The military judge sentenced Appellant to a dishonorable discharge, confinement for 18 years, forfeiture of all pay and allowances, and reduction to the grade of E-1.[2] The convening authority took no action on the findings or sentence.

Appellant raises seven assignments of error which we have reordered and reworded: (1) whether Appellant's conviction was legally and factually sufficient; (2) whether the military judge abused his discretion in denying a defense request for an expert witness; (3) whether the military judge abused his discretion by allowing the victim's representative to present a victim impact statement that included videos, personal pictures, stock images of future events, and lyrical music that touched on themes of dying, saying farewell, and becoming an angel in heaven; (4) whether trial counsel committed prosecutorial misconduct during her sentencing argument; (5) whether the military judge abused his discretion by failing to suppress Appellant's statements to law enforcement personnel; (6) whether Appellant's due process rights were violated because Article 118(3), UCMJ, 10 U.S.C. § 918(3), does not list manslaughter as a lesser included offense, thereby foreclosing his ability to reduce his criminal exposure by pleading not guilty to an offense charged, but guilty to a named lesser included offense; and (7) whether the Government can prove beyond a reasonable doubt that the military judge's failure to instruct the panel that a guilty verdict must be unanimous was harmless.[3]

With respect to issues (5), (6), and (7), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

---

[1] All references to the UCMJ and the Rules for Courts-Martial (R.C.M) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM).*

[2] Appellant was awarded 118 days of pretrial confinement credit.

[3] Issues (1), (5), and (6) were personally raised by Appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

## I. BACKGROUND

Appellant joined the Air Force in January 2013. At the time of his trial, he was 27 years old, and worked as an aircraft maintainer at Ellsworth Air Force Base, South Dakota. In September 2018, Appellant began dating CM, and the two moved in together in July 2019. In September 2019, their first child, ZC, was born. Later that year, in December 2019, Appellant and CM became engaged and were living in a house in Rapid City, South Dakota. Their two roommates, BS and BS's husband, lived in the lower level of the house.

On the morning of 3 March 2020, CM woke up, fed and changed ZC, and placed him in his car seat so that Appellant could drop him off at daycare on his way to work. Appellant left with ZC around 0645 and dropped ZC off around 0700. CM was scheduled to work that day from 0800 until 2130 hours. CM testified that ZC's daycare provider sent her multiple pictures and messages throughout the morning indicating that ZC was happy and acting normally. Around noon, Appellant was released from work early to prepare for an upcoming exercise. Appellant picked up ZC from daycare on his way home and arrived home at approximately 1300.

BS testified that she saw Appellant arrive home and take ZC upstairs with him. She went upstairs to get food between 1400 and 1500, at which point she saw ZC in his jumper seat near Appellant who was playing video games. BS stated that ZC seemed normal and happy, and she returned to her bedroom on the lower level of the house. BS stated that at times that afternoon she could hear that ZC was "unusually" fussy. BS testified that at some point after returning to her room she heard footsteps upstairs and then a loud noise. At 1730 she texted her husband concerning ZC; one of those messages read as follows:

> Idk what [Appellant] is doing but [ZC] has been super fussy and every time he starts screaming it sounds like [Appellant] throws something or jumps around like he's pissed off that he has to stop playing his game then he'll stomp to their room and leave [ZC] in there and I can hear him screaming and [Appellant] walking around. Idk if he's getting annoyed or what but it irritates me every time. It doesn't sound like he tries to calm him or anything he just lets him scream[.]

Right after sending the message, BS testified that she heard Appellant calling her name and rushing to her bedroom door. She stated Appellant was holding ZC and saying that he didn't know what was wrong with him. BS testified that ZC was limp, not holding his head up, and did not appear normal. She remembered Appellant telling her that he gave ZC a bottle and then heard ZC making a gurgling noise.

BS called 911 at 1732 and testified that she was the one who spent the majority of the time speaking with the emergency operator. BS told the operator that ZC was not breathing. While waiting for the ambulance, Appellant and BS gave ZC mouth-to-mouth resuscitation. BS testified Appellant appeared to be in shock and said things like, "Oh god. His eyes are fogging, his eyes are fogging;" "Come on Bubba, come on Bubba;" and "Come on, come on little man." Shortly thereafter, paramedics and police officers arrived.

Officer SB, from the Rapid City Police Department (RCPD), was one of the officers who responded to Appellant's house. Officer SB testified that he spoke with Appellant while paramedics attended to ZC, and Appellant told him that ZC was sleeping, woke up fussy, and that he started making gurgling noises when Appellant attempted to feed him a bottle. Officer SB then stated Appellant told him that after ZC started making the gurgling noises, that ZC's eyes were closed, his body was limp, and he wasn't responding to his name.

An ambulance took ZC to the emergency room at Monument Hospital in Rapid City, South Dakota. Shortly thereafter CM joined Appellant at the hospital. Dr. AN, a board-certified emergency physician was working that evening and provided medical treatment to ZC. Dr. AN testified at trial as an expert witness in the field of emergency medicine. Dr. AN stated that when ZC arrived at the emergency room, his breathing was slow and shallow, his color was pale, and his body was limp. Dr. AN also noted that ZC's forehead was discolored and swollen. Dr. AN testified that medical providers performed chest compressions, secured ZC's airway, began intravenous medications, and performed a computed tomography (CT) scan of ZC's head.[4] According to Dr. AN, the CT scan revealed that ZC had bleeding in the brain, and ZC's condition was caused by "non-accidental trauma, subdural hematoma, and metabolic acidosis."

Shortly after he arrived at the hospital on March 3, 2020, Officer SB was informed by the medical staff treating ZC that ZC had a "brain bleed." He relayed that news to Appellant and CM, and told them that ZC was going to be airlifted to Sanford Children's Hospital in Sioux Falls, South Dakota. Appellant started crying and stated "I'm an idiot. [Crying] I feel so bad. He hit his head, I thought it was nothing. [Inaudible] It was under my watch; I feel so bad." Officer SB asked Appellant and CM if they were willing to go to the police department to speak with investigators, and both agreed. Of note, Officer SB's body camera captured Appellant's responses described above. The video footage was admitted as a prosecution exhibit and played for the members during trial.

---

[4] A computed tomography scan is a medical imaging technique used to obtain detailed internal images of the body.

RCPD Detectives SW and DH spoke with Appellant after he arrived at the police department. CM was separately interviewed. Detective SB testified they "still didn't really know what was going on" at that point, so they conducted a "non-custodial interview" of Appellant. Detective SW stated he informed Appellant in the opening minutes of the interview that he was not required to speak with them and that he was free to leave at any time. Also, he informed Appellant that no matter what was discussed, "he wouldn't be placed under arrest that day and he would be free to get up and leave." Detective SW stated Appellant acknowledged that he did not have to speak with investigators. During his testimony, Detective SW confirmed that the interview was recorded and the substantive portion of the interview lasted approximately two hours. The recorded interview was admitted as a prosecution exhibit and was played during trial for the members.

After Appellant agreed to speak with them, Detective SW asked Appellant to "walk [them] through" what had happened. Appellant then went on to describe the entire morning and his picking ZC up from daycare early. Appellant told investigators that he put ZC in his baby activity jumper seat to play a short time after arriving home. According to Appellant, when he went to let his dog outside, he heard a loud bang and looked over at ZC in his jumper. Appellant stated that ZC just smiled at him and continued to play as normal. Appellant then stated that he fed ZC and laid him down for a nap. Appellant explained that when ZC woke up from his nap, he was fussy and inconsolably crying. Appellant then stated that he gave ZC another bottle and laid him down around 1730 hours, but soon thereafter heard ZC making noises. When Appellant went to check on ZC, Appellant explained to investigators that he found ZC limp and unresponsive.

Detective SW confirmed with Appellant that ZC did not have any medical conditions, physical ailments, or reported issues at daycare, and that he had been acting normal up until Appellant found him unresponsive. Appellant then mentioned that after ZC woke up from the nap, "he just wasn't that happy baby anymore. He was that fussy. He was just fussy." Detective SW asked Appellant about the details of the incident he described in the jumper to include: what the bang sounded like; how often ZC used the jumper; and if ZC had ever been injured in the jumper before. Detective SW also asked Appellant how CM was with ZC. Appellant answered that CM adored ZC and that he had never "seen somebody love something like that."

Later in the interview, Detective SW asked Appellant if there was anything else he could think of that might have injured ZC. Appellant answered in the negative. The investigators told Appellant that if ZC had bumped his head while in the jumper, he would not have experienced such a serious injury. Detective SW stated, "We know that [ZC] did not get this injury from the jumper."

5

He then asked, "Is this a one-time thing where something happened or what -
- I mean, what happened, man?" Appellant responded he had dropped ZC, but
had withheld that information because he was scared people would think he
abused ZC. Detective DH replied, "Just like [SW] said a minute ago, neither he
nor I, doubt one tiny bit that you love your son. That's obvious. I don't doubt
that. Not at all. Just so we can understand, and also it may help doctors help
your son, walk us through what happened."

Appellant then told investigators he dropped ZC while seated on the couch
trying to feed him, and ZC fell face first onto the carpeted floor in the living
room. Detective SW questioned Appellant's story with skepticism:

> The same people that I deal with on a weekly, if not daily, basis,
> the same people that have talked to me about children injuries
> and stuff like that, that have given me the training to know that
> this injury didn't happen by him being in a bouncer. This injury
> ain't going to happen from a 5[-]month-old just dropping 2 or 3
> feet on carpeted ground, okay. I know that for a fact, to the point
> of -- I have several kids myself, one of which is the same age as
> your kid, has fallen off a bed from higher than that and nothing
> happens. It doesn't happen, okay. It's time to start giving the
> truth. We can't keep lying about this stuff. I mean, were you
> frustrated; couldn't get the kid to stop crying? What was going
> on?

Appellant responded to Detective SW's questions by claiming that he sat ZC
on the kitchen counter and when Appellant turned to get his bottle, ZC leaned
forward and fell off the counter onto the hardwood floor in the kitchen. Appel-
lant stated, "I should have known better because he's only 5 months, so he's
not going to keep himself up." Detective SW then asked, "[h]ow many times are
we going to dance around this?" Appellant replied that he "didn't do anything
to [his] child." The exchange then progressed as follows:

> [Detective SW]: I know it's hard, man. You don't get to sleep. You
> don't get to do anything anymore. It's hard and it's frustrating.
> Temperatures -- and temp -- I mean, tempers rise. It happens to
> you. It happens to all of us, okay. You're not a bad guy, but some-
> thing happened. We can't change what happened in the past. All
> we can do is face ourselves in the future and, you know, decide
> what kind of man we want to be from this point because what
> happened, happened. Now it's about trying to make it right. Like
> my partner here said, it's not just us asking. Anything you can
> tell us about how this really happened can help those doctors fix
> him up too. We need -- we need to know the truth.

[Detective DH]: If they don't know the mechanism of injury, they can't treat the injury as effectively. Does that make sense?

[Appellant]: Yeah.

[Detective DH]: I mean your son's injury is very serious, so any assistance that we can have to treat him is very important.

The exchange continued by Detective DH asking Appellant to help them "help the doctors." To which he responded:

[Appellant]: Did I really hit my kid? Did I really get so mad at him that I just hit him? How could I not remember something like that? I'm a horrible father, you know. Why would I hit my own kid?

[Detective DH]: That level of frustration can lead us to do things that we just don't expect in ourselves. Like you don't know what to do. You just feel yourself backed into a corner.

[Appellant]: But to hit my own kid like out of frustration and just -- Why? I didn't mean -- I didn't mean to do it. Oh God. I put my kid in the hospital.

[Detective SW]: Was it like with an object or just your hand or what?

[Appellant]: I didn't -- I don't remember having any objects, so probably just my hand. I might have just punched him. But why would I do it?

[Detective SW]: Is that what happened?

[Appellant]: I think so.

[Detective SW]: What do you mean, you think so?

[Appellant]: I just remember I was getting upset. I was -- I was just getting frustrated because he just wouldn't stop crying. I just -- next thing I know, he's eating and he's fine and then –[.]

[Detective SW]: Come on, [Appellant].

[Detective DH]: Help us understand what happened, so we can help your son as best we can.

[Detective SW]: You know what happened in there, enough to come up with these other stories that we all know aren't true. Did you hit him? Was it just one hit or multiple or -- what happened?

[Appellant]: It was just once, but it was hard.

[Detective SW]: Was it with your left or right hand?

[Appellant]: My dominant hand [holding right hand up].

[Detective SW]: Right hand. Was it just with your fist or -- [?]

[Appellant]: [Affirmative response.]

[Detective DH]: Were you holding him?

[Appellant]: No. He was laying down.

[Detective DH]: On the floor?

[Appellant]: In his little taco thing.

[Detective SW]: When did that happen?

[Appellant]: About around 4:30. He just wouldn't stop crying.

[Detective SW]: Mmm-hmm.

[Appellant]: I didn't know what to do. I just -- I was afraid you guys were going to take my kid from me. Yes, 4:30. He just wouldn't stop. I thought maybe he was hungry. I tried to give him his bottle. He just wasn't having it. I didn't know what to do. I got frustrated. I put him in his taco, walked off, tried to cool down. He just kept screaming and screaming and screaming. I was like, I don't know what to do. I really don't know what to do. Instead of going downstairs and asking my roommate to help, I just let that -- the frustration, the anger, just build up inside me. Instead of taking it out on something else like normal people would do, I took it out on my own son. It's not his fault. He's only 5 months. It's not his fault. He can't help it. He can't tell me what's wrong. He can't -- [.]

[Detective SW]: Where did you hit him at?

[Appellant]: I hit him in the forehead.

[Detective SW]: Just the one time?

[Appellant]: [Affirmative response.]

[Detective SW]: What happened after that?

[Appellant]: He started crying some more. I mean, I wasn't expecting him to be quiet after that. I just socked my kid.

[Detective SW]: Mmm-hmm.

[Appellant]: And he just -- he cried for a little bit. He stopped. I picked him up. He stopped. Then it was about 5 o'clock-ish and

> I tried to give him his bottle again. He ate it, but there was just
> -- the way he was eating, he could -- it didn't seem normal.

Appellant later stated that he "was more surprised than anything. Like, I literally just hit my kid and my kid just looked at me with a smile -- not a smile, but he looked like -- he looked at me like you're my guardian. I didn't feel like it." He went on to explain:

> I just felt like I let him down. When he did that, my heart just
> sank because I knew it was my fault. When he stopped, when he
> didn't respond, and then when I picked him up and he was limp,
> the worst of worst feelings came to mind. Sorry.

While Appellant was speaking to investigators, ZC was airlifted to the pediatric specialty center. At trial, Dr. KS, a forensic pathologist at Sanford Children's Hospital, testified as an expert witness for the Government in the field of forensic pathology. Dr. KS confirmed a number of additional medical tests were conducted upon ZC's arrival. For example, an eye exam revealed that ZC had extensive bilateral retinal hemorrhages, which is indicative of an abusive or non-accidental head injury. Dr. KS also testified a second CT scan was performed on ZC's head. He stated that this scan showed bilateral subdural hemorrhages and severe hypoxic-ischemic injury—meaning injury to the brain caused by a lack of oxygen and blood flow. Dr. KS also stated that a skeletal survey was completed with no fractured bones noted. Dr. KS. testified ZC died on 12 March 2020, nine days after arriving at the hospital, "[d]espite medical therapy."

Dr. KS also performed ZC's autopsy which revealed that ZC had a bruise on the right side of his forehead, a second lighter smaller bruise in the middle of his forehead, and a bruise on the outside of his left ear. ZC's internal organs showed no signs of disease or injury. Dr. KS also noted the post-mortem physical examination of ZC's brain reflected the hemorrhages previously seen on the CT scans. He also explained that ZC's brain was swollen, and the injuries to ZC's brain were indicative of significant trauma to the outside of the head. Dr. KS also noted the autopsy revealed hemorrhaging around the spinal cord in ZC's neck area, which he attributed to rapid acceleration and deceleration of the head. He further opined that a combination of shaking and punching would explain all of ZC's injuries. Finally, Dr. KS testified that the manner of death was homicide, and specifically stated ZC "died as a result of a traumatic brain injury due to an assault that ha[d] components of blunt force injury and a rapid acceleration, deceleration injury."

The panel of officer and enlisted members found Appellant guilty of one specification of murder.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant contends his conviction of murder is both legally and factually insufficient. Specifically, Appellant argues the injuries ZC "sustained do not align with [his] confession," and a single punch could not have caused all of ZC's injuries. Additionally, Appellant contends the character evidence presented at trial that Appellant was generally a gentle, peaceful, and patient person contrasts with the violent murder of which he was convicted and calls into question whether the Government met its burden of proof. We disagree with Appellant's contentions and find no relief is warranted.

#### 1. Additional Background

During their case-in chief, the Defense called two expert witnesses. The first was Dr. AZ, a pediatric radiologist. Dr. AZ testified the first CT scan did not show any swelling of ZC's brain. Dr. AZ had reviewed the x-rays and testified he did not see any classical metaphyseal lesions which are fractures that can occur when shaking an infant and are highly associated with child abuse. He also stated no rib fractures were present. Consistent with the Government's experts, Dr. AZ agreed the first CT scan did show subdural hemorrhaging, and the second CT scan showed swelling of ZC's brain. On cross-examination, Dr. AZ also confirmed he had seen cases of abusive head trauma without any bone fractures.

The second witness was Dr. DF, who was recognized as an expert witness in the fields of forensic pathology and biomechanics. Dr. DF testified ZC's subdural hemorrhages, brain swelling, retinal hemorrhages, neck injuries, and multiple bruises to his forehead could all be the result of falling from the kitchen counter. During cross-examination, Dr. DF agreed that all of ZC's injuries were also consistent with an infant who had been punched and shaken. Furthermore, Dr. DF testified that he could not exclude shaking as the cause of death because ZC exhibited the "classic triad" of injuries associated with shaking: subdural hemorrhages, profuse retinal hemorrhages, and brain swelling.

During its rebuttal case, the Government called Colonel (Col) SM, a pediatrician, who was recognized as an expert in the fields of general and child-abuse pediatrics. Col SM testified she had reviewed many cases of infant shaking that did not show additional injuries beyond bleeding within the skull, brain injuries, and retinal hemorrhages—in other words, no bone fractures or retinoschisis. Col SM stated ZC's injuries were not consistent with hitting his head on a jumper, falling to a carpeted floor from his father's lap, or falling from the kitchen counter. Finally, Col SM opined ZC's injuries were consistent with a punch or punches to the head, combined with shaking.

**2. Law**

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, No. 22-0111, 2022 CAAF LEXIS 278 (C.A.A.F. 12 Apr. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of murder while engaging in an act inherently dangerous to another in violation of Article 118, UCMJ, which required the

Government to prove five elements beyond a reasonable doubt: (1) that ZC is dead; (2) that ZC's death resulted from the intentional acts of Appellant, specifically striking ZC in the head and shaking ZC on 3 March 2020 at or near Rapid City, South Dakota; (3) Appellant's act was inherently dangerous to another and showed a wanton disregard for human life; (4) Appellant knew that death or great bodily harm was a probable consequence of the act; and (5) the killing was unlawful. *See Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 56.b.(3).

### 3. Analysis

During Appellant's court-martial, the Government introduced convincing evidence of his guilt. Most significantly, the evidence demonstrated that on the morning of 3 March 2020, ZC was a healthy and happy baby and remained that way until approximately 1500 that afternoon. The evidence also established that sometime between 1500 and 1730, ZC suffered major injuries to his head and brain while in the sole custody of Appellant, and those injuries resulted in his death. This evidence was established by the testimony of ZC's mother, ZC's daycare provider, and Appellant's roommate, BS. BS also confirmed ZC was "super fussy" after 1500 on the afternoon of 3 March 2020, and that Appellant sounded like he was angry and he either threw something or "stomped" on the floor. She explained she was so concerned that she sent a text message to her husband regarding what she heard. BS testified Appellant called her name and came rushing to her room asking for help moments after she sent the text. She testified that ZC was "limp" and not acting "normal." The Government also presented testimony from three medical experts who all stated ZC's multiple injuries to his head and brain were consistent with being punched and shaken. Finally, the Government presented Appellant's own statements to Detectives SW and DH, where he admitted to punching ZC in the forehead out of frustration.

We are not persuaded that Appellant only admitting to punching ZC in the head one time somehow weakens the Government's case. In fact, even without Appellant's admission, the evidence admitted into the record at trial provides a factually and legally sufficient basis for Appellant's conviction. Nor are we persuaded that the character evidence related to Appellant's general nature for peacefulness overcomes evidence of guilt. We conclude that viewing the evidence in the light most favorable to the Prosecution demonstrates a rational trier of fact could have found the essential elements of murder while engaging in an act inherently dangerous to another beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41 (citation omitted).

**B. Expert Witness Request**

Appellant argues the military judge abused his discretion in denying a defense request for an expert witness. Specifically, Appellant contends that he was entitled to the production of a forensic psychologist with expertise in false confessions, because "the false confession was the heart of Appellant's defense." Appellant asks us to set aside his conviction and sentence. We find that the military judge did not abuse his discretion and conclude that no relief is warranted.

**1. Additional Background**

Defense counsel requested the appointment of Dr. SR as an expert consultant on 13 December 2020. Dr. SR is a forensic psychologist who specializes and teaches in the field of false confessions. On 22 January 2021, the convening authority denied Appellant's request.[5] On 27 January 2021, Defense moved the court to compel the production of Dr. SR as an expert consultant. The Government filed a response in opposition on 28 January 2021. Neither side requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing on the issue and none was held. In support of their motion, the Defense did not offer any statement from Appellant claiming that any part of his statement to law enforcement was false or any statement from Dr. SR on how the science behind false confessions applied to Appellant's case. On 3 February 2021, after considering the filings of the parties, the military judge issued his written ruling denying the motion to compel.

In his written ruling, the military judge indicated he had considered the defense arguments and he addressed Appellant's failure to establish (1) that an expert would be of assistance to the Defense, and (2) that denial of the expert assistance would result in a fundamentally unfair trial. As to the first prong, the military judge concluded the Defense failed to establish why the expert was needed. Specifically, the military judge stated that the Defense "provided little evidence, if any to support the contention the [Appellant] made [a] false [ ] statement[ ]." The military judge also explained that "the [D]efense proffered no information, academic or otherwise, that connect[ed] the facts of this case with a false confession." The military judge concluded no evidence was presented that indicated "the evidence at issue [was] beyond the ability of the [Appellant's] accomplished defense counsel." As to the second prong, the military judge found the Defense failed to demonstrate how the denial of expert

---

[5] Four months earlier, on 6 August 2020, the convening authority had appointed Dr. KG as a confidential expert consultant for the Defense in the field of forensic psychology. The court further notes that the convening authority also provided additional expert consultants in the fields of forensic pathology, pediatric radiology, and child-abuse pediatrics.

assistance would result in a fundamentally unfair trial. The military judge again explained that "the [D]efense has the tools necessary to appropriately defend the [Appellant] during the merits portion of [the] trial and present evidence in extenuation and mitigation, should th[e] case reach the sentencing phase of [the] trial."

**2. Law**

We review a military judge's ruling on a motion to compel expert assistance for an abuse of discretion. *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010) (citation omitted). "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (quoting *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)).

This "standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (internal quotation marks and citations omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and [a military judge's decision] will not be reversed so long as the decision remains within that range." *United States v. Gore,* 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). "When judicial action is taken in a discretionary matter, such action can not be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (quoting *United States v. Sanchez*, 65 M.J. 145, 148 (C.A.A.F. 2007)).

Our superior court has also explained that:

> [S]ervicemembers are entitled to . . . expert assistance when necessary for an adequate defense. The mere possibility of assistance is not sufficient to prevail on the request. Instead, the accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial. To establish the first prong, the accused must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop.

*Freeman*, 65 M.J. at 458 (first alteration in original) (internal quotation marks and citations omitted).

### 3. Analysis

Neither party contends that the military judge's findings of fact were clearly erroneous. We agree that there is sufficient evidence in the record to support the military judge's findings of fact. Therefore, we turn our attention to the military judge's application of the law. We note at the outset that Appellant does not allege the military judge applied incorrect principles of law. In fact, Appellant cites much of the same authority the military judge relied upon in his ruling. Instead, Appellant argues that the military judge reached the wrong conclusion. Therefore, we review whether the military judge's decision was clearly unreasonable—and conclude that it was not.

We find that the military judge's application of the law to the facts was not clearly unreasonable because the Defense did not establish the necessity of the requested expert assistance. At best, the Defense showed that an expert in false confessions offered the mere possibility of assistance. In its motion to compel, the Defense stated an expert was needed to examine "issues surrounding susceptibility to suggestion, the methods [law enforcement officers] used, and how those factors *potentially* caused [Appellant] to provide a false explanation for his son's injuries." (Emphasis added). We note the Defense never actually provided any evidence that the confession Appellant made to law enforcement officers was false. Additionally, we find that Appellant presented no evidence that he suffered from any abnormal mental or emotional problems that made him susceptible to making false incriminatory statements in response to criminal accusations. *See United States v. Bresnahan,* 62 M.J. 137, 143 (C.A.A.F. 2005) (denial of a defense request for expert assistance was not an abuse of discretion where defense failed to provide evidence that the confession was actually false).

Furthermore, we do not find that the military judge abused his discretion in concluding that an expert was not necessary to present or understand evidence relating to what Appellant told law enforcement officials. We agree with the military judge's conclusion that this evidence was not overly complicated, and that Appellant's defense counsel were more than capable, and in fact did challenge and explain the substance of Appellant's interview with the RCPD detectives. Here, the military judge clearly articulated his findings of fact and conclusions of law, and his decision was not based on an incorrect view of the law. Therefore, we find that the military judge did not abuse his discretion when he denied the defense motion to compel expert assistance in the field of forensic psychology with expertise in false confessions.

### C. Format of Victim Impact Unsworn Statement

Appellant contends the military judge abused his discretion by allowing the victim's representative to present a victim impact statement that included a

PowerPoint presentation containing videos, personal pictures, stock images of future events, and lyrical music that touched on themes of dying, saying fare-well, and becoming an angel in heaven. While we agree with Appellant that the military judged erred, we do not find that Appellant suffered any prejudice as a result of the error, and thus find no relief is warranted.

### 1. Additional Background

During the Government's sentencing case, both CM and CM's mother tes-tified under oath and without objection. CM's mother primarily testified about the impact of ZC's death on her and CM. More specifically, CM's mother testi-fied about receiving a "hysterical" phone call from CM on 3 March 2020 regard-ing ZC's medical emergency. She described how she immediately flew to her daughter's side and was present with her at the hospital for ZC's last days of life. She told the military judge that seeing ZC in the hospital was "horrific" and "the worst thing [she] ever had to witness in [her] entire life." She de-scribed the days leading up to his death as "[e]xactly what [she] imagined [her] hell would be." CM's mother also explained she was deeply impacted by ZC's death, telling the military judge that his death and watching her daughter grapple with it "changed [her] entire life" and there were days when she could not get out of bed or function normally. She also described how, shortly before trial, she requested medication to help her cope with her grief and there were days where she considered taking her own life. CM's mother also described the negative impact ZC's death had on her daughter, stating that "[a]lmost every night I get [S]napchats of my child crying, talking about how she misses her child, [and how] she misses being a mommy."

During CM's testimony, she described how excited she was to become a mother, how horrifying it was when she received the phone call that ZC was being rushed to the hospital, and the difficult days she spent in the hospital with ZC hoping that he would recover. She also described, in great detail, the process of deciding to withdraw life support, the moment ZC died in her arms, and her suffering after his death. In terms of the impact of ZC's death, CM described that she "lost nearly everything" including her ability to trust others, her child, her relationship with Appellant, and "the future [she] thought [she] had." CM said she still thinks about ZC "[e]very minute of every day." As part of her testimony, CM referenced three pages of pictures which were later ad-mitted as a prosecution exhibit. The first page was a photo of the wall in ZC's hospital room that was covered in photos she had hung and a "#[ZC]strong" sign. The second page was a photo of CM looking at ZC in the hospital, and the third page was a photo of CM cuddling ZC in his hospital bed.

Following the conclusion of the Government's sentencing case, CM, who had been appointed as the Article 6b, UCMJ, 10 U.S.C. § 806b, representative for ZC, made an unsworn statement. The unsworn statement consisted of CM

orally addressing the military judge while using a PowerPoint slide show that consisted of pictures, videos, music with lyrics, and stock images of important life events. Prior to the unsworn statement, the Defense objected to the slideshow. In particular, the Defense argued the slideshow was not an oral or written statement within the meaning of Rule for Courts-Martial (R.C.M.) 1001(c), and that it was designed to appeal to emotion. The military judge overruled the objections.

**2. Law**

We review a military judge's interpretation of R.C.M. 1001[6] de novo, but review a decision regarding the presentation of victim impact statements in presentencing for an abuse of discretion. *See United States v. Hamilton*, 78 M.J. 335, 340 (C.A.A.F. 2019); *United States v. Barker*, 77 M.J. 377, 382–83 (C.A.A.F. 2018). A military judge abuses his or her discretion when he or she makes a ruling based on an erroneous view of the law. *See Barker*, 77 M.J. at 383.

Article 6b, UCMJ, details several rights belonging to crime victims. Among them are "[t]he right to be reasonably heard at . . . [a] sentencing hearing relating to the offense," and "[t]he reasonable right to confer with the counsel representing the Government" at a court-martial proceeding relating to the offense. Articles 6b(a)(4)(B) and 6b(a)(5), UCMJ, 10 U.S.C. § 806b(a)(4)(B), 806b(a)(5); *see also* R.C.M. 1001(c)(1) ("[A] crime victim of an offense of which the accused has been found guilty has the right to be reasonably heard at the presentencing proceeding relating to that offense.").

"The crime victim may make an unsworn statement and . . . [t]he unsworn statement may be oral, written, or both." R.C.M. 1001(c)(5)(A). "[T]he right to make an unsworn victim statement belongs solely to the victim or the victim's designee and not to trial counsel." *United States v. Edwards*, ___ M.J. ___, No. 21-0245, 2022 CAAF LEXIS 283, at *16 (C.A.A.F. 14 Apr. 2022) (first citing *Barker*, 77 M.J. at 378; and then citing *Hamilton*, 78 M.J. at 342). This "right 'is separate and distinct from the [G]*overnment's* right to offer victim impact statements in *aggravation*, under R.C.M. 1001(b)(4).'" *Id.* (quoting *Barker*, 77 M.J. at 378).

Notwithstanding a victim's right to be reasonably heard, a military judge has the responsibility to "[e]nsure that the dignity and decorum of the

---

[6] Rules addressing a victim's right to be reasonably heard were contained in R.C.M. 1001A, *Manual for Courts-Martial, United States* (2016 ed.). However, those rules are now contained in R.C.M. 1001(c). *See* 2019 *MCM*, App. 15, at A15-18 ("R.C.M. 1001(c) is new and incorporates R.C.M. 1001A of the MCM (2016 edition)."). Our analysis cites to these versions as applicable.

proceedings are maintained," and shall "exercise reasonable control over the proceedings." R.C.M. 801(a)(2)–(3); *see also LRM v. Kastenberg*, 72 M.J. 364, 372 (C.A.A.F. 2013) (holding a victim's "right to a reasonable opportunity to be heard on factual and legal grounds" is "subject to reasonable limitations and the military judge retains appropriate discretion under R.C.M. 801").

When testing for prejudice in the context of sentencing, we determine whether the error substantially influenced the adjudged sentence by considering "the following four factors: '(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question.'" *Hamilton*, 78 M.J. at 343 (quoting *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017)). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Barker*, 77 M.J. at 384 (citation omitted). An error is more likely to be harmless when the evidence was not "critical on a pivotal issue in the case." *United States v. Cano*, 61 M.J. 74, 77–78 (C.A.A.F. 2005) (internal quotation marks and citation omitted).

### 3. Analysis

In light of our superior court's recent decision in *Edwards,* we find that the military judge erred by allowing the victim's Article 6b representative to use a PowerPoint presentation that included videos, personal pictures, stock images of future events, and lyrical music, because the contents of the pictures, music and videos were neither a written nor oral statement within the scope of R.C.M. 1001(c). 2022 CAAF LEXIS 283, at *16.

In *Edwards*, the Court of Appeals for the Armed Forces (CAAF), determined the military judge abused his discretion when he allowed the deceased victim's father to present an unsworn impact statement that included a video produced by trial counsel. *Id.* at *1–2. The video featured trial counsel interviewing the victim's family and a slide show of photographs set to acoustic background music. *Id.* The court concluded the military judge had erred for two reasons: (1) a video including acoustic music and pictures is neither a written nor oral statement as required by the Rules for Courts-Martial, and (2) because trial counsel produced the video, the statement was—in part—trial counsel's rather than that of the victim, while the right to make a statement solely belongs to victim or the victim's designee. *Id.* at *2. The majority in *Edwards* determined that a remedy was warranted because the Government had not met its burden to show that the video did not substantially influence the sentence. *Id.* at *2–3.

As in *Edwards*, the presentation here exceeded the scope of a written or oral statement; therefore, we conclude the military judge erred, and we turn

our attention to the question of prejudice. We find the Government has demonstrated that the use of the PowerPoint presentation did not substantially influence Appellant's sentence and therefore conclude that no remedy is warranted.

Specifically, we find that the four factors articulated in *Barker* all weigh in the Government's favor. 77 M.J. at 384. First, the Government's case was exceptionally strong. The evidence in aggravation showed that Appellant killed his 5-month-old son after he became frustrated with his child's crying. The testimony of CM and the child's grandmother described in great detail how excited CM was to become a mother, what it was like for them to get the phone call that ZC was being rushed to the hospital, the painful days in the hospital with ZC hoping he would recover, the process of deciding to withdraw ZC's life support, the moment ZC died in CM's arms, and the long-lasting impacts they both continued to suffer.

With respect to the second factor, we find Appellant's sentencing case was weak relative to the Government's case. The Defense called a number of witnesses to speak to Appellant's rehabilitative potential, some of whom had already testified in findings. Most of the admitted witness testimony was in the form of pre-recorded video statements. Appellant also gave a verbal unsworn statement in a question-and-answer format. The unsworn statement was focused on Appellant's own pain, the fact that he was not able to support CM emotionally following ZC's death, and that he did not get to say good-bye to ZC or attend the funeral because he was in pretrial confinement. We find this factor also weighs in the Government's favor.

The third factor—the materiality of the evidence—also weighs in favor of the Government. As our superior court noted in *Edwards*, prejudice is more likely when "the information conveyed as a result of the error was not already obvious from what was presented at trial." 2022 CAAF LEXIS 283, at *21 (citation omitted). Overall, we find the information contained in the PowerPoint presentation was cumulative to the information that had already been properly received during both the trial and sentencing proceedings. In fact, both CM and her mother had already testified during the sentencing proceedings and conveyed the profound pain and devastating impact that Appellant's crime had on them. Additionally, unlike *Edwards*, trial counsel did not play or use any portion of the victim's unsworn statement in her sentencing argument. This supports our conclusion that the PowerPoint was not material at trial and pushes the third factor in favor of the Government.

The fourth *Barker* factor, the quality of the evidence, also weighs in favor of the Government. We highlight an important difference between this case and the circumstances that occurred in *Edwards.* In *Edwards,* the CAAF found that the statement was improper, and that remedy was appropriate, in part,

because it deemed the video was actually a statement from the trial counsel and not a statement of the victim. Here, ZC's Article 6b, UCMJ, representative, CM, created the PowerPoint presentation herself. CM chose the pictures, and she picked the videos and music. Neither party suggests on appeal that trial counsel had any involvement whatsoever. Moreover, it is also worth noting that in this case, trial counsel did not present or play the presentation. Instead, CM spoke in person, directly to the military judge, and used the slide presentation as a demonstrative aid to help illustrate her words. Unprompted and without questions from trial counsel, CM spoke directly to the military judge, in a military judge alone sentencing proceeding, for almost three pages of the transcript. We find CM's spoken words comply with the requirements for a proper victim's statement under R.C.M. 1001(c) and thus would have conveyed the same basic message even without the use of the PowerPoint presentation. Finally, as noted above, trial counsel did not play or reference any part of the unsworn statement during argument, and the unsworn statement contributed little to the Government's case that was not already evident through properly admitted evidence. For these reasons, we find the fourth factor also favors the Government and leads to our conclusion the Government has shown that the PowerPoint presentation did not substantially influence Appellant's sentence.

## D. Trial Counsel's Sentencing Argument

Appellant claims that trial counsel committed prosecutorial misconduct during her sentencing argument. Specifically Appellant argues that trial counsel improperly (1) argued that Appellant struck ZC as a result of his built-up frustration and anger with ZC's crying; (2) referenced the media attention and members present in the courtroom to improperly pressure the military judge; and (3) argued that Appellant's false statements were matters in aggravation. The Defense did not object at any point during argument. We conclude that trial counsel's argument was not plainly improper.[7]

### 1. Additional Background

Appellant elected to be tried by a panel of officer and enlisted members. Once he was convicted, Appellant elected to be sentenced by military judge alone. During the findings portion of the trial, the Government introduced multiple statements Appellant made to his roommate (BS), first responders, and law enforcement investigators about the cause of ZC's injuries. Because the statements contradicted each other, the military judge instructed the members

---

[7] Appellant also requests that even if we determine that issues 3 and 4 warrant no relief individually, that we consider and issue a ruling on the cumulative effect of the alleged sentencing errors. Since we only find error with regard to issue 3, we find the doctrine of cumulative error inapplicable to Appellant's case. *See United States v. Banks,* 36 M.J. 150, 170–71 (C.M.A. 1992).

before findings on the use of false exculpatory statements. Specifically, he advised:

> If you believe there has been evidence that, after the offense allegedly committed, the accused may have given false explanations about the alleged offense or surrounding facts and circumstances, consider this:
>
> Conduct of an accused, including statements made and acts done upon being informed that a crime may have been committed or upon being confronted with a criminal charge, may be considered by you in light of other evidence in the case in determining the guilt or innocence of the accused.
>
> If an accused voluntarily offers an explanation or makes some statement tending to establish his innocence, and such explanation or statement is later shown to be false, you may consider whether this circumstantial evidence points to consciousness of guilt. You may infer that an innocent person does not ordinarily find it necessary to invent or fabricate a voluntary explanation or statement tending to establish his innocence. The drawing of this inference is not required.
>
> Whether the statement made, was voluntary, or was false is for you to decide. You may also properly consider the circumstances under which the statements were given, such as the environment, under which they were given.
>
> Whether evidence as to an accused's voluntary explanation or statement points to a consciousness of guilt, and the significance, if any, to be attached to any such evidence, are matters for determination by you, the court members.

Later during an Article 39(a), UCMJ, session, after findings had been announced but before the sentencing phase began, the parties argued the admissibility of additional false exculpatory statements Appellant made to various family members or friends who were on the defense witness list for sentencing. The evidence discussed during this session concerned Appellant's statements that he was forced by police to confess and that he did not remember confessing. Trial counsel eventually withdrew their request to admit these statements.

The Defense called a number of live witnesses during its sentencing case. During cross-examination of the character witnesses, trial counsel asked a series of questions about whether the witnesses were aware of the false statements Appellant had made about lack of memory of his confession, lack of memory about what happened to ZC, and being forced to confess by police. Trial

defense counsel objected to these questions, but the objections were overruled. The military judge ruled the questions were permissible under R.C.M. 1001(b)(5)(e) since evidence of Appellant's rehabilitative potential was elicited from the witnesses by trial defense counsel.

Trial counsel organized the Government's sentencing argument into three sections: aggravation, mitigation, and victim impact. During the aggravation portion of the argument, trial counsel began by discussing the nonviolent choices Appellant had when ZC was inconsolable on the day of the crime. Trial counsel then played a video clip of Appellant's law enforcement interview where Appellant acknowledged, "[I]nstead of going downstairs and asking my roommate for help, I just let the frustration, the anger, just build up inside me." Immediately following the video clip, trial counsel stated "this is aggravating" and went on to argue that despite having multiple viable nonviolent avenues for ZC's care, Appellant let his anger and frustration get the best of him and chose to resort to violence.

Trial counsel then discussed the false statements Appellant made about the cause of ZC's injuries which had been admitted during the Government's case-in-chief. More specifically, trial counsel argued that Appellant's false statements about the source of his son's injuries were aggravating because they showed a lack of remorse and compromised his son's treatment:

> But what he does not do, he doesn't tell the truth about what just happened? In that split second [Appellant] goes from beating his son into self-preservation mode. He is more interested in protecting himself, keeping himself out of trouble then [sic] getting his son the help that he so desperately needs. He tells [his roommate], I don't know what happened. A couple of minutes later, the first responders show up, he has a little bit more time, and he tells them well, I'm not sure what happened, [ZC] was feeding and ma[de] some choking noise. But I just don't know what happened.

> He gets to the hospital, and the doctors say, your kid has a bruise on his head. So, then [Appellant] says, oh well it was the taco -- or the bouncy thing, the jumper. And then when he goes to law enforcement, while his son is fighting for his life, [Appellant] tells lie, after lie, after lie, after lie, until we finally get a piece of truth. [Appellant] finally admits, yes, I punched my son.

> . . . .

> [Appellant's] repeated lies were designed to keep him out of trouble and were in complete disregard to the well-being and safety

of his baby. These are aggravating circumstances surrounding the [Appellant]'s crime.

During the rehabilitation section of her argument, trial counsel mentioned the false statements Appellant made regarding memory loss of his confession and being forced by law enforcement to confess. Trial counsel then went on to highlight the impact of Appellant's crime on ZC, CM, and members of their family.

Trial counsel concluded her argument by urging the military judge to consider general deterrence in assessing the sentence:

> This shows you how serious the [Appellant]'s crime is. Your sentence, Your Honor, must reflect that. You have seen the media, and you see the people in the courtroom, and you have heard witness testimony talking about the media interest in this case, the world is watching. The world wants to know what price tag you're going to put on this [Appellant] for murdering his son. Send a message that promotes respect for the law. Send a message to deter others from ever thinking of doing what [Appellant] did. And send a message to promote justice in this case, Your Honor. And that must include at least 20 to 25 years['] confinement, a dishonorable discharge, and reduction in rank to E-1, and total forfeitures.

Trial defense counsel did not object at any point during trial counsel's sentencing argument. At the conclusion of trial defense counsel's sentencing argument, the military judge offered both parties another opportunity to object to opposing counsel's argument. Both parties answered in the negative.

**2. Law**

Whether an accused has waived or merely forfeited an issue is a question of law we review de novo. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citing *United States v. Rosenthal*, 62 M.J. 261, 262 (C.A.A.F. 2005)).

"Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Id.* (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). Issues that are waived leave no error for this court to correct on appeal. *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (citing *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005)). An affirmative statement that an Accused at trial has "no objection" generally "constitutes an affirmative waiver of the right or admission at issue." *United States v. Swift*, 76 M.J. 210, 217 (C.A.A.F. 2017) (citations omitted).

The issue of "[i]mproper argument is a question of law that we review de novo." *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citation omitted). However, if the defense does not object to a sentencing argument by trial counsel, we review the issue for plain error. *Id.* (citing *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007)). To establish plain error, an appellant "must prove the existence of error, that the error was plain or obvious, and that the error resulted in material prejudice to a substantial right." *Id.* at 106 (citing *Erickson*, 65 M.J. at 223). Again, because "all three prongs must be satisfied in order to find plain error, the failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

During sentencing argument, "[t]rial counsel may . . . refer to the sentencing considerations set forth in R.C.M. 1002(f)." R.C.M. 1001(h). These considerations include "the nature and circumstances of the offense and the history and characteristics of the accused." R.C.M. 1002(f)(1). They also include the "impact of the offense on" the "social, psychological, or medical well-being of any victim of the offense," R.C.M. 1002(f)(2)(A), and on "the mission, discipline, or efficiency of the command of the accused and any victim of the offense." R.C.M. 1002(f)(2)(B). In addition to these considerations, trial counsel may refer to the need for the sentence to: "(A) reflect the seriousness of the offense; (B) promote respect for the law; (C) provide just punishment for the offense; (D) promote adequate deterrence of misconduct; (E) protect others from further crimes by the accused; [and,] (F) rehabilitate the accused . . . ." R.C.M. 1001(h); R.C.M. 1002(f)(3).

"Trial counsel is entitled to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Frey*, 73 M.J. at 248 (internal quotation marks and citation omitted). "[E]ither party may comment on properly admitted unsworn victim statements" during presentencing argument. *United States v. Tyler*, 81 M.J. 108, 113 (C.A.A.F. 2021).

"During sentencing argument, the trial counsel is at liberty to strike hard, but not foul, blows." *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (internal quotation marks and citation omitted). "[T]he argument by a trial counsel must be viewed within the context of the entire court-martial." *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000). "The focus of our inquiry should not be on words in isolation, but on the argument as viewed in context." *Id.* (internal quotation marks and citations omitted).

"The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *Baer*, 53 M.J. at 237). Three factors "guide our determination of the prejudicial effect of improper argument: '(1) the severity of the misconduct, (2) the measures

adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction[s].'" *United States v. Sewell,* 76 M.J. 14, 18 (C.A.A.F. 2017) (alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005)). "In applying the *Fletcher* factors in the context of an allegedly improper sentencing argument, we consider whether trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the appellant was sentenced on the basis of the evidence alone." *Halpin*, 71 M.J. at 480 (alteration, internal quotation marks, and citation omitted).

"[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter,* 51 M.J. 393, 397 (C.A.A.F. 1999)).

"In a military judge alone case we would normally presume that the military judge would disregard any improper comments by counsel during argument and such comments would have no effect on determining an appropriate sentence." *United States v. Waldrup*, 30 M.J. 1126, 1132 (N.M.C.M.R. 1989).

**3. Analysis**

The Government argues that trial defense counsel waived any objection to trial counsel's argument by virtue of announcing they had no objections at the end of the argument and that we should not address any of the issues raised by Appellant on appeal regarding trial counsel's argument. We decline the Government's request, instead consider the issues forfeited, and review for plain error.

Appellant first contends trial counsel improperly argued that Appellant struck ZC out of his built-up anger and frustration with ZC's crying. Appellant reasons that this evidence constituted the actus reus of the offense, and therefore was not proper evidence of aggravation. We disagree. The actus reus of Appellant's crime was striking ZC in the head and shaking ZC. Here, trial counsel commented on properly admitted evidence and argued it was an aggravating factor that Appellant's motive was anger and frustration when he had multiple other nonviolent options for ZC's care. These matters related directly to the offense of which Appellant was convicted. We find no error, plain or otherwise, with this argument.

Next, Appellant contends that trial counsel's reference to the media and spectator attention on the case was improper because it improperly pressured the military judge to comply with trial counsel's sentence recommendation. We disagree and find trial counsel's argument was a permissible method to argue for general deterrence and justice.

For support, Appellant relies on *United States v. Norwood*, 81 M.J. 12 (C.A.A.F. 2021). In that case, the trial counsel asked the members, without

objection, to think about what would happen "when you all return to your normal duties . . . . [A]nd someone asks you . . . . 'Wow, what did [Appellant] get for that?' Do you really want your answer to be 'nothing at all'?" *Id.* at 19 (alterations in original). Under a plain error standard of review, the CAAF set aside the sentence, finding the trial counsel had improperly "pressured the members to consider how their fellow service-members would judge them and the sentence they adjudged instead of the evidence at hand." *Id.* at 21. The CAAF reasoned, "Arguing an inflammatory hypothetical scenario with no basis in evidence amounts to improper argument that we have repeatedly, and quite recently, condemned." *Id.* (citing *United States v. Voorhees*, 79 M.J. 5, 14–15 (C.A.A.F. 2019)). The CAAF reminded practitioners that "[t]rial counsel may properly ask for a severe sentence, but [they] cannot threaten the court members with the specter of contempt or ostracism if they reject [their] request." *Id.* (alterations in original) (quoting *United States v. Wood*, 40 C.M.R. 3, 9 (C.M.A. 1969)).

However, in our view, unlike *Norwood*, the remarks here cannot be understood to pressure or threaten the military judge with contempt or ostracism from others if he reached a sentence that was less than trial counsel's recommended sentence. At no point did trial counsel suggest that others would judge him unfavorably if he imposed, or did not impose, a certain sentence. Trial counsel frequently referenced the evidence in the case, explaining the aggravating circumstances of Appellant's crime, and argued that the sentence should promote general deterrence, respect for the law, and justice. As our court has recently stated, "We decline to extend *Norwood* to remarks aimed at specific or general deterrence that are founded in the record and devoid of pressure or threats." *United States v. Jackson*, No. ACM 39955, 2022 CCA LEXIS 300, at *95 (A.F. Ct. Crim. App. 23 May 2022) (unpub. op.). We therefore conclude that Appellant has not demonstrated trial counsel's argument, in context, was clear or obvious error. *See Erickson*, 65 M.J. at 223.

Finally, Appellant claims that trial counsel's reference to false statements was not proper evidence in aggravation. Appellant bases his argument, in part, on the premise that trial counsel acknowledged Appellant's statements regarding being forced by police to confess and not remembering his confession were not proper matters of aggravation. However, we see no evidence that trial counsel used these statements at all during argument. The only false statements trial counsel argued as evidence in aggravation were statements Appellant made to his roommate, first responders, and law enforcement about the cause of ZC's injuries. This was permissible because the evidence showed, and trial counsel argued, that having an accurate history of how the injuries occurred would have assisted in providing ZC medical care. In fact, this argument was supported by multiple medical providers who testified about the importance of having an accurate history of a patient's injury when providing treatment.

Additionally, during the interview with Appellant, Detective SW informed him that an accurate history would help medical providers care for ZC. Using this evidence, trial counsel argued that Appellant's false statements were aggravating because Appellant was "more interested in protecting himself, keeping himself out of trouble" than getting ZC "the help he so desperately need[ed]" and Appellant's "lies were designed to keep him out of trouble and were in complete disregard to the well-being and safety of his baby." We do not find that trial counsel engaged in the improper argument of saying merely lying about the offense alone constituted aggravating evidence. Rather, we find that trial counsel properly connected the false statements to the negative impact on ZC's medical care, which he was only receiving as a direct result of Appellant's crime. Therefore, we conclude Appellant has failed to show that trial counsel's argument constituted plain or obvious error.

Even if we were to assume error, plain or obvious, the sentencing authority in this case was a military judge, sitting alone. Military judges are presumed to know the law and to follow it absent clear evidence to the contrary. *Erickson*, 65 M.J. at 225 (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)). Here, there is no evidence to rebut that presumption. Finally, after weighing the *Fletcher* factors together and considering trial counsel's arguments in context, we are confident that the military judge properly sentenced Appellant on the basis of the evidence alone. *Erickson*, 65 M.J. at 224.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court